## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.: 11-276-1 (EGS)** |
| | : | |
| **KERRY F. KHAN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MOTION FOR SECTION 5K1.1 DOWNWARD DEPARTURE AND MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia, hereby submits this motion for downward departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("USSG" or "Guidelines") and memorandum in aid of sentencing concerning the defendant, Kerry F. Khan ("Khan"). The Pre-Sentence Report ("PSR") calculated the defendant's total offense level under the Guidelines at a 41 (324-405 months). *See* PSR at p. 36, ¶ 180. The government and the defendant stipulated in the plea agreement to a total offense level under the Guidelines at a 39 (262-327 months).

### SUMMARY OF THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government submits that a sentence at an offense level 39 (pre-departure) is reasonable in light of, among other things, the seriousness of the offense, the need to specifically deter the defendant, and the need to afford adequate general deterrence. The defendant master-minded the largest domestic bribery and bid-steering scheme in the history of federal contracting. In his role as a public official, the defendant had responsibility for awarding contracts and subcontracts through a $1 billion federal contract, called the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract. The defendant led a crime ring of corrupt public officials and corrupt government contractors that stole over $30 million through inflated and fictitious invoices.

In addition to his role with the TIGER Contract, the defendant was the public official primarily responsible for attempting to obtain approval for a planned $1 billion federal contract, called the called the Contingency Operations Readiness Engineering & Support ("CORES") Contract.  In that capacity, the defendant attempted to steer that planned contract to a favored government contractor in exchange for additional payments.

The defendant's anti-social conduct was not confined to fraud and public corruption.  As described in greater detail below, the defendant was captured on intercepted wire and electronic communications discussing an apparent physical assault on his Filipino mistress by an associate in the Philippines.  He was also captured on intercepted communications discussing plans to travel to the Philippines for the apparent purpose of engaging in prostitution with a girl represented to him to be fifteen years-old.  Those travel plans were disrupted by law enforcement agents during the course of the undercover operation.  Such extraordinary criminal acts and anti-social conduct merit harsh punishment.

Since his arrest on October 4, 2011, however, the defendant has attempted to make some amends for his wrongful conduct.  As described in greater detail below, the defendant provided substantial assistance to law enforcement in the investigation and prosecution of others, particularly his oldest son, Lee Khan, and his youngest sibling, Nazim Khan.  As a result of that cooperation, the government recommends a three-level downward departure under Section 5K1.1 of the Guidelines, which results in a total offense level of 36 (188-235 months).  The government specifically recommends a sentence of 188 months, three years of supervised release, and restitution in the amount of $32,553,252.93 payable to the United States Army Corps of Engineers ("USACE").

## FACTUAL BACKGROUND

On May 7, 2012, the defendant pleaded guilty to Counts Two and Four of the Indictment, which charged bribery of a public official, in violation of 18 U.S.C. § 201 (Count Two), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Four).[1]  In the Statement of Offense, which Khan signed as part of his plea agreement, the parties agreed that from 1994 until October 4, 2011, Khan was employed as a public official with USACE.   Khan was assigned to USACE's Headquarters at 441 G Street, N.W., in the District of Columbia.  At the time of his arrest, Khan was a Program Manager and Contracting Officer's Technical Representative ("COTR") for USACE's Directorate of Contingency Operations ("DCO"), which provided deployable technical engineering capabilities to the Department of Defense, United States Army, and other federal agencies.  As part of his official duties, Khan was responsible for, among other things, placing orders for products and services for USACE through federal government contracts and certifying that products and services provided through government contracts were received by USACE.

Khan did not act alone within USACE as part of the scheme.  Until October 4, 2011, Michael A. Alexander ("Alexander") was the Program Manager of the Field Force Engineering ("FFE") program for USACE's DCO at Headquarters in Washington, D.C.[2]  As part of his official duties,

---

[1]     As part of the plea agreement, the government has agreed at sentencing to dismiss Count One of the Indictment, which charged conspiracy to commit bribery and wire fraud, in violation of 18 U.S.C. § 371.  Count Three, which charged co-defendant Harold F. Babb only, has already been dismissed on the government's motion.

[2]     On February 13, 2012, Alexander pleaded guilty to Counts Two and Four of the Indictment.  *See United States v. Michael A. Alexander*, 11-cr-276-003 (EGS).  On September 13, 2012, he was sentenced to 72 months imprisonment, followed by three years supervised release.

Alexander was responsible for, among other things, developing requirements, writing program and project justifications, and obtaining funding for USACE projects and programs placed through government contracts.

1.      **The bribery scheme involving the TIGER Contract**

In or about March 2006, Khan was reassigned within USACE and began supporting Alexander's FFE program, which required contractor support through government contracts. Khan and Alexander agreed to work together to obtain USACE contracts for corrupt contractors who would pay bribes to Khan and Alexander in exchange for Khan and Alexander exercising their official duties to direct USACE contracts to the contractors. Khan's official duties in the bribery scheme included preparing statements of work for the contracts, placing the contracts with the corrupt contractors, and falsely certifying that USACE received the equipment and services required by the contracts.

Khan also obtained assistance for the bribery scheme from certain employees at Eyak Technology, LLC ("EyakTek"), an Alaska Native Corporation with an office in Dulles, Virginia. EyakTek was the prime contractor for the TIGER Contract. The TIGER Contract was a vehicle used by authorized federal government agencies and departments to purchase products and services. The TIGER Contract was an audited and awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") contract. As a result, such authorized agencies and departments were not required to obtain three separate bids or to compare the TIGER Contract to another contract before submitting an invoice for products and services through the TIGER Contract.

Specifically, Khan enlisted Harold F. Babb ("Babb"), the Director of Contracts at EyakTek, in the bribery scheme.[3]  In or about 2007, Khan introduced Alexander to Babb and EyakTek.  Khan, Alexander, and Babb agreed to use the TIGER Contract as a vehicle to award USACE subcontracts to corrupt contractors in exchange for payments from the subcontractors that would be split between Khan, Alexander, Babb, and others.

Through his administration of the TIGER Contract, Khan directed subcontractors to submit fraudulently inflated subcontracts to EyakTek for equipment and services to be provided under the TIGER Contract.  In most cases, these corrupt subcontractors provided to USACE the equipment and services legitimately included in the contracts, but also billed for the inflated and fictitious equipment and services included in the contracts.[4]  Khan referred to the fraudulently inflated amounts as "overhead."  Khan caused USACE to approve and remit payment to EyakTek, which in turn remitted payment to the subcontractors, including the fictitious and fraudulently inflated portions.  As directed by Khan, Alexander, and Babb, the subcontractors paid the inflated and fictitious amounts included in the contracts for the benefit of Khan, Alexander, Babb, and others. From the Spring of 2007 through October 4, 2011, Khan was paid, directly and indirectly, over $12

---

[3]     On March 13, 2012, Babb pleaded guilty to Counts One and Two of a Superseding Information, which charged bribery of a public official, in violation of 18 U.S.C. § 201 (Count One), and unlawful kickbacks, in violation of 41 U.S.C. § 8702(2) (Count Two).  *See United States v. Harold F. Babb*, 11-cr-276-004 (EGS).  On October 18, 2012, he was sentenced to 87 months imprisonment, followed by three years of supervised release.

[4]     The invoices for two subcontractors, Ananke and Big Surf Construction Management, were entirely fictitious and USACE received no goods or services in exchange for the payments.  In addition, certain of the invoices for two other corrupt contractors, Nova Datacom and Alpha Technology Group, were entirely fictitious and USACE received no goods or services in exchange for the payments related to those particular invoices.

million through the bribery scheme.  At the time of Khan's arrest on October 4, 2011, Khan was

owed over $14 million in "overhead" from two of the subcontractors.

A.       **Alpha Technology Group**

The bribery scheme appears to have begun in the Spring of 2007 involving a government

contractor called Alpha Technology Group, Inc. ("ATG"), which was headquartered in Waldorf,

Maryland.   Robert L. McKinney ("McKinney") was the President of ATG.[5]   McKinney was

introduced to Khan through Khan's brother, Nazim S. Khan ("Nazim Khan"), who owned an auto

body shop frequented by McKinney.[6]

From May 2007 through March 2008, Khan and McKinney used direct contracts and

subcontracts awarded to ATG to obtain approximately $856,395 from the government through

fraudulent invoices.   Rather than pay Khan directly, there was an agreement between Khan,

McKinney, and Nazim Khan to pay Khan through KC Builders Custom Homes LLC ("KC

Builders"), a home improvement company controlled by Nazim Khan.   As directed by Khan,

McKinney caused ATG to submit invoices to USACE and EyakTek for total costs exceeding

$1,800,000, including approximately $856,395 in "overhead."

The "overhead" was split between Khan, Nazim Khan, and McKinney.   ATG kept

approximately $244,491 of the "overhead." McKinney caused ATG to pay approximately $611,904

---

[5]       On February 13, 2012, McKinney pleaded guilty to a one count Information, which charged bribery of a public official, in violation of 18 U.S.C. § 201.  *See United States v. Robert L. McKinney*, 12-cr-0018 (EGS).  On October 17, 2012, he was sentenced to 33 months imprisonment, followed by three years supervised release.

[6]       On June 27, 2012, Nazim Khan pleaded guilty to a one count Information, which charged conspiracy to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371.  *See United States v. Nazim S. Khan*, 12-cr-0098 (EGS).  On December 6, 2012, he was sentenced to 24 months imprisonment, followed by three years supervised release.

of the "overhead" to KC Builders.  KC Builders retained approximately $83,404 and paid the remainder, which was approximately $528,500, to Khan.  In addition to the payments to Khan derived from "overhead," McKinney paid an additional amount of approximately $10,000-$15,000 in cash to Khan.  According to McKinney and Nazim Khan, they ended their involvement in the bribery scheme because of Khan's increasingly erratic behavior.

### B.   Nova Datacom

Having tasted some success with the bribery scheme through ATG, Khan continued the scheme and increased its size through Nova Datacom, LLC ("Nova Datacom").  Khan was introduced to Nova Datacom by Nick Park ("Park").[7]  In 2007, Park became employed by Nova Datacom and introduced Khan to the company and to its Chief Technology Officer, Alex Cho ("Cho").[8]  Following discussions with Park and Cho, Khan agreed to use his official position to direct contracts and subcontracts from USACE to Nova Datacom in exchange for money and other things of value.

From July 2007 through October 4, 2011, Khan, Alexander, Park, Cho, and Nova Datacom's President, referred to as Nova Datacom Employee A, used contracts and subcontracts awarded by USACE to Nova Datacom to obtain and to attempt to obtain over $20 million from the government

---

[7]     On June 20, 2012, Park pleaded guilty to a two count Information, which charged two counts of bribery of a public official, in violation of 18 U.S.C. § 201.  *See United States v. Nochol Park, a/k/a Nick Park*, 12-cr-0102 (EGS).  Count One of the Information charged Park with bribing Khan.  Count Two of the Information charged Park with bribing a second public official, referred to as Public Official C.  Park's sentencing has not been scheduled.

[8]     On September 20, 2011, Cho pleaded guilty to a two count Information, which charged conspiracy to commit bribery, money laundering, and wire fraud, in violation of 18 U.S.C. § 371 (Count One), and bribery of a public official, in violation of 18 U.S.C. § 201 (Count Two).  *See United States v. Young N. Cho, a/k/a Alex N. Cho*, 11-cr-0276 (EGS).  Cho's sentencing is scheduled for February 26, 2013.

through fraudulent invoices.  At Khan's direction, Cho submitted fraudulently inflated quotes to USACE for the work performed on the direct awards and to EyakTek for the work performed on the subcontracts.  In most cases, Nova Datacom provided to USACE the equipment and services legitimately included on the contracts and subcontracts, but also billed for the "overhead," *i.e.*, the inflated and fictitious equipment and services included on the contracts.  Khan caused USACE to approve and remit payment to EyakTek for the fraudulently inflated invoices.  After subtracting its profit margin, EyakTek paid the remainder to Nova Datacom.  This remainder included payment for the "overhead."

Khan was also instrumental in introducing Babb into the scheme with Nova Datacom.  In 2008, Khan introduced Babb to Cho.  With Khan's knowledge and consent, Babb agreed to accept kickbacks from Cho as compensation for Babb providing favorable treatment to Nova Datacom in connection with subcontracts between Nova Datacom and EyakTek.

From the Spring of 2007 through October 4, 2011, USACE awarded contracts and subcontracts to Nova Datacom in excess of $45,000,000.  Of that amount, there was over $20 million in "overhead' included in the contracts and subcontracts.  In addition, in the Summer of 2011, after Cho began cooperating with the government, Khan and others schemed to include over $5 million as "overhead" in orders they planned to award to Nova Datacom.

During that time period, Nova Datacom provided things of value, directly and indirectly, to Khan of approximately $7.5 million.  These payments included, among others, the following: (i) payments to Khan personally and to accounts controlled by Khan of over $6 million; (ii) payments to a home improvement contractor to renovate multiple properties for the benefit of Khan; (iii) payments to multiple retailers to furnish and improve properties for the benefit of Khan, including

flat screen televisions, computer equipment, and furniture; (iv) employment with Nova Datacom for Khan's oldest son, Lee A. Khan ("Lee Khan"),[9] and another close family member, referred to as Khan Family Member A; (v) payments for the benefit of Lee Khan, Khan Family Member A, and another close family member of Khan in excess of $800,000; (vi) payments to car dealerships to lease and purchase Acura TL-S, BMW M3, BMW 335i, BMW X6, and Infiniti G35 automobiles for the benefit of Khan, Lee Khan, Khan Family Member A, and another close family member of Khan; (vii) payments to criminal defense attorneys and a criminal defense investigator for the benefit of Khan Family Member A; (viii) payments to improve property in Berkeley Springs, West Virginia intended for the benefit of Khan; (ix) payments to and for the benefit of Khan's mistresses in Virginia, Florida, Maryland, and the Philippines; and (x) miscellaneous payments for the benefit of Khan, including two Rolex watches, high-end liquor, clothing expenses at Nieman-Marcus, first-class airline tickets, and luxury international hotel accommodations.  At the time of Khan's arrest on October 4, 2011, Nova Datacom owed Khan over $6 million in overhead.[10]

### C.   Big Surf

While engaging in the bribery and kickback scheme with Nova Datacom, Khan and Babb enhanced the audacity of the scheme by directing subcontracts to Big Surf Construction Management LLC, also known as Big Surf CM LLC ("Big Surf").  James Edward Miller ("Miller") controlled Big

---

[9]     On May 7, 2011, Lee Khan pleaded guilty to a Superseding One Count Information, which charged conspiracy to commit money laundering, in violation of 18 U.S.C. § 371.  *See United States v. Lee A. Khan*, 11-cr-0276-002 (EGS).  On January 31, 2013, he was sentenced to 37 months imprisonment, followed by three years supervised release.

[10]     Khan also knew that Nova Datacom was paying bribes to Public Official C, a contracting officer employed by the United States Department of the Army.

Surf.[11]  Unlike ATG and Nova Datacom, which billed for legitimate services as well as "overhead,"

Big Surf billed EyakTek for "overhead" only.  From April 2008 through February 24, 2009, Khan,

Babb, and Miller used subcontracts awarded by USACE to Big Surf to obtain and to attempt to

obtain $9,979,705.32 from the government through fictitious invoices.

USACE awarded four subcontracts to Big Surf.  Each subcontract was fictitious.  That is,

Khan, Babb, and Miller knew that Big Surf provided no equipment or services to USACE or

EyakTek.  Miller, through Big Surf, obtained $8,041,285.32 from three of the four fictitious

subcontracts.  Of that amount, Miller paid $3,641,310.04 to Ananke for Khan's benefit from

proceeds obtained through the first two subcontracts.  Khan terminated his relationship with Miller

after Miller reneged on Miller's promise to pay the vast majority of the proceeds from the third

subcontract to Khan.  In effect, as a result of the third subcontract, Khan, Babb, and Miller stole

$3,393,949.95 from the government through a fictitious invoice, and Miller then stole that money

from Khan and Babb by not turning over their share of the proceeds to them.  As a result of Miller's

betrayal, Khan canceled a fourth intended subcontract to Big Surf valued at $1,938,420, and re-

issued it in identical form to a more loyal member of the conspiracy, Nova Datacom.[12]

### D.   Ananke

Apparently not satisfied with being just the corrupt public official, Khan also agreed to play

the dual role of the corrupt government official and corrupt government contractor in the case of

---

[11]     On April 18, 2012, Miller pleaded guilty to a one count Information, which charged conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  *See United States v. James Edward Miller*, 12-cr-0063 (EGS).  On October 16, 2012, he was sentenced to 70 months imprisonment, followed by three years supervised release.

[12]     The subcontract re-issued to Nova Datacom, like the one initially intended for Big Surf, consisted of $1,938,420 in "overhead" only and no legitimate equipment or services.

Ananke, LLC ("Ananke").  In April 2008, Khan, Babb, and a TIGER Account Executive at EyakTek, referred to as EyakTek Employee A, directed a USACE subcontract from EyakTek to Ananke. Anake was a shell company controlled by Khan.

Babb and EyakTek Employee A agreed to direct the subcontract to Ananke to assist Khan with Khan's intent to operate a government contracting company after Khan retired from USACE. The subcontract directed to Ananke while Khan remained a government official enabled Ananke to obtain, among other things, past performance references.  Khan, Babb, and EyakTek Employee A understood that the past performance references would allow Khan to attempt to establish Ananke as an 8(a) small disadvantaged business with the U.S. Small Business Administration immediately upon Khan's planned retirement.

EyakTek issued one subcontract to Ananke.  The amount of the subcontract was $147,544. Khan knew that Ananke had not provided any equipment or services pursuant to the subcontract. Khan, through Ananke, received $147,544 as a result of the subcontract.

### E.    Core Technology LLC and Enterprise Technical Solutions Incorporated

From 2008 through October 4, 2011, Khan directed the award of subcontracts to Core Technology LLC ("Core Technology") and Enterprise Technical Solutions Incorporated ("ETSI"), which were controlled by Larry G. Corbett ("Corbett"), in exchange for approximately $640,000 in bribe payments.[13]  In 2008, Corbett's companies were providing materials to USACE, under Khan's supervision, through subcontracts.  Khan and Corbett agreed that Corbett would provide payments

---

[13]    On July 24, 2012, Corbett pleaded guilty to a one count Information, which charged bribery of a public official, in violation of 18 U.S.C. § 201.  *See United States v. Larry G. Corbett*, 12-cr-0152 (EGS).  On November 13, 2012, he was sentenced to 27 months imprisonment, followed by three years supervised release.

to Khan to obtain and retain business with USACE.  From January 2009 through October 4, 2011, Corbett paid approximately $640,000 to Ananke for Khan's intended benefit and to AcePoint Consulting for Lee Khan's intended benefit.  During that time period, Corbett also provided home improvements for Khan's benefit.

2.       **The intended bid steering scheme involving the CORES Contract**

As part of their efforts to obtain greater control over the bribery scheme, certain of the bribery co-conspirators and others agreed to steer the award of the CORES Contract by USACE to Nova Datacom.  Khan and the others intended the CORES Contract to be valued at nearly $1 billion over a five-year period.  The motive for steering the CORES Contract to Nova Datacom varied depending upon the co-conspirators' self-interest.  For Khan, according to intercepted communications and consensually monitored conversations with Cho, the CORES Contract represented a contracting vehicle that he could use to enrich himself after his planned departure from the government.  *See* Declaration of Special Agent J. Howard Arp ("Arp Dec.") at ¶ 4 (attached hereto as Tab 1).

By the summer of 2011, after Cho began to cooperate with law enforcement, Khan wanted to retire from USACE.  At one point, in July 2011, Khan submitted papers for early retirement from USACE.  Khan's bid for early retirement was not successful due to his age (he was too young for early retirement).  As a result of his plans to leave USACE, Khan viewed the CORES Contract as an opportunity for him to do business with USACE after he left the government.  More specifically, he expected Nova Datacom, which would be the prime contractor for the CORES Contract, to award subcontracts to a company controlled by his son, Lee Khan.  Khan also expressed an interest in providing consulting services for other companies that would use the CORES Contract.  *Id.*

-12-

Before he could realize that goal, however, Khan had to garner USACE's interest in the CORES Contract.  To obtain USACE's approval to move forward with a solicitation to potential bidders for the CORES Contract, it was necessary for there to be a procurement need for such a contract by a group within USACE.  Khan intended to provide the procurement need for the CORES Contract via the USACE projects managed by Khan.  Khan, along with others, provided information for the CORES Contract to a USACE contracting officer in Vicksburg, Mississippi, referred to as Contracting Officer A, to attempt to obtain USACE's approval to issue the solicitation to potential bidders.  Khan intended to approve the solicitation prior to its issuance to potential bidders.  *Id.* ¶ 5.

While garnering USACE's interest for the CORES Contract, Khan was also working with Nova Datacom to ensure that any solicitation to potential bidders provided Nova Datacom with an unfair advantage.  On at least two occasions, Khan, Cho, and other Nova Datacom employees met at a hotel to discuss drafting the statement of objectives/statement of work for the CORES Contract.  The discussion included different ways that Nova Datacom could draft the statement to provide Nova Datacom with an unfair advantage over other potential bidders.  *Id.* ¶ 6.

After solicitation of the CORES Contract to potential bidders, Khan knew that he would need to exercise influence over the internal government selection panel that would recommend the award of the contract to the ultimate prime contractor.  Initially, Khan intended to be the chair of the selection panel to ensure the award of the CORES Contract to Nova Datacom.  Later, in the Summer of 2011, after he expressed an intent to resign from USACE, Khan and Alexander expressed the need for them to have a "trusted" person on the selection panel.  Khan intended the "trusted" person to be his co-worker at USACE and his successor as the COTR for USACE's Directorate of

Contingency Operations.  Khan discussed the arrangement with his co-worker, who agreed to chair the selection panel.  *Id.* ¶ 7.

Not wanting to leave trust too much to chance, however, Khan provided things of value to his trusted co-worker.  In July 2011, for instance, Khan paid $56,105 as a down payment on a two-year lease for a 2012 BMW 650i for his co-worker.  The list price for the BMW was $103,800.  Khan funded the purchase of the BMW 650i with proceeds traceable to the bribery scheme.  *Id.* ¶ 8.  A photograph of the BMW is attached as Tab 2.

The co-worker knowingly accepted payment for the BMW from Khan.  In an intercepted phone call on July 28, 2011, Khan and his co-worker discussed Khan purchasing a car for the co-worker.  During the call, Khan identified the dealership as "BMW Fairfax" and said that he would be visiting the dealership that evening.  Later that evening, Khan called the co-worker to report that the car would be a "soft top" and a "convertible."  The following day, Khan called the co-worker and instructed the co-worker to go to the website for BMW of Fairfax and to fill out a finance application.  Khan told the co-worker, "You're going to be happy, very happy, with the payment," and, "It's like a hundred dollars a month, for two years."  Later in the conversation, Khan instructed the co-worker how to fill out the application and told the co-worker to "put down 56,000," and that "104 - 175 is the price, and that's loaded with everything."  Later that evening, Khan sent a text message to the co-worker that read: "Congratulations :) Be at BMW of Fairfax at 9am on Saturday . . . it's ready to go. Enjoy!"  Khan's co-worker used the vehicle, including driving it to and from the co-worker's place of work at USACE's headquarters in Washington, D.C., until it was seized by the government on October 4, 2011.  *Id.* ¶ 9.

Khan made other payments for the benefit of his co-worker.  On August 18, 2011, Khan purchased five official checks, totaling $23,853.91, with funds drawn from an account that he controlled in the name of Adrasteak Insurance Corporation.  All of the checks listed Khan's co-worker as the purchaser.  The checks were made payable to a home improvement company and were intended to pay for work on the co-worker's home.  The co-worker knowingly accepted the official checks from Khan and used one of the checks to pay the home improvement company before the government seized the other four checks from the co-worker on October 4, 2011.  *Id.* ¶ 10.

As a result of Khan's arrest on October 4, 2011, the CORES Contract was stopped in its tracks before it was issued for solicitation to potential prime contractors.

## **ARGUMENT**

### I.     **The defendant provided substantial assistance in the investigation and prosecution of others.**

The government moves for a downward departure under Section 5K1.1 of the Sentencing Guidelines.  The defendant provided substantial assistance to the government during its investigation and prosecution of other individuals concerning the bribery scheme.  The defendant has met with the criminal investigators and prosecutors several times.  The defendant began to meet with investigators and prosecutors on December 7, 2011.  By agreeing to cooperate at an early stage of the investigation and providing critical information to investigators about the transactions, the defendant assisted the government in obtaining plea agreements from other co-conspirators.  In particular, the defendant explained conversations that he had with Harold Babb concerning the fictitious invoices submitted by Big Surf, which contributed to Babb's eventual plea agreement.  The defendant also provided information incriminating his son, Lee Khan, and brother, Nazim Khan, in the bribery and money

laundering scheme, which led to their plea agreements.  Further, Khan's willingness to plead guilty and to implicate Larry Corbett in the bribery scheme likely influenced the final decision by Corbett to plead guilty.

Khan also provided substantial assistance in the investigation of other co-conspirators.  He has shared his personal knowledge of bribe payments to another public official, Public Official C.  He has also shared his personal knowledge of bribe payments made by Nova Datacom's former President.  In addition, he has shared his personal knowledge concerning the involvement of other Nova Datacom employees in the attempt to steer the CORES Contract to Nova Datacom.

In addition to his cooperation in the criminal investigation, Khan has submitted to an interview with the civil investigators and attorneys in their civil investigation of the prime contractor and subcontractors for the TIGER Contract.

Based on this substantial assistance, the government recommends a three-level downward departure, resulting in total adjusted offense level of 36 (188-235 months).

## II.   Based on the sentencing factors in 18 U.S.C. § 3553(a), the government recommends a sentence at the low-end of the advisory Guidelines range.

### A.   The applicable advisory Guidelines range should be 262-327 months.

The Supreme Court has declared that, in terms of determining an appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range").  Although advisory, the Guidelines assure some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to

-16-

the Guidelines, while carefully considering the factors set forth in 18 U.S.C. § 3553(a) particularly

relevant to an individual defendant, minimizes the disfavored result of basing sentences on the luck

of the draw in judicial assignments.  Therefore, the Supreme Court has held that "district courts must

begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing

process."  *Gall*, 552 U.S. at 50 n.6.

### 1.   The parties' stipulated Guidelines range

Here, the parties stipulated in the plea agreement to a Total Adjusted Offense Level of 39,

with an attendant range of 262-327 months' imprisonment, based on the following:

### a.   Offense Level under the Sentencing Guidelines for Bribery

The parties agreed that the following Sentencing Guidelines sections applied to the charge

for bribery (Count Two):

| | | |
|---|---|---|
| § 2C1.1(a)(1) | Base Offense Level | 14 |
| § 2C1.1(b)(1) | More than one bribe | 2 |
| § 2C1.1(b)(2) | More than $20,000,000 in payments | 22 |
| § 3B1.1(c) | Aggravating Role (organizer/leader) | 2 |
| Total | | 40 |

### b.   Offense Level under the Sentencing Guidelines for Conspiracy to Commit Money Laundering

The parties agreed that the following Sentencing Guidelines sections applied to the charge

for conspiracy to commit money laundering (Count Four):

| | | |
|---|---|---|
| § 2S1.1(a)(1) | Offense Level for Underlying Offense, not including Chapter 3 adjustments | 38 |
| § 2S1.1(b)(2) | Conviction under Title 18, United States Code, Section 1956 | 2 |
| § 2S1.1(b)(3) | Sophisticated laundering | 2 |
| Total | | 42 |

c.      **Acceptance of Responsibility:  3-Level Reduction**

The parties agreed that a 3-level reduction was appropriate, pursuant to U.S.S.G. § 3E1.1(a) and (b), based on the defendant's acceptance of responsibility.  Based on a 3-level reduction for acceptance of responsibility, the defendant's stipulated offense level was 39 (262-327 months).

## 2.      The Probation Office's proposed Guidelines range.

The Probation Office determined that Khan's total offense level was a 41.  *See* PSR at p. 25, ¶¶ 114-124.  The two point difference between the parties' stipulated offense level (39) and the Probation Office's determination (41) is that the Probation Office added a two point enhancement for Khan's role in the money laundering offense as an organizer or leader.  *Id.* ¶ 118.  The Government, however, did not consider Khan to be an organizer or leader for the offense of conviction for conspiracy to commit money laundering.

## B.      The nature and circumstances of the offense support a within-Guidelines sentence.

The nature and circumstances of the offense demonstrate that a Guidelines sentence at an offense level 39 (pre-departure) is reasonable in light of the extraordinary circumstances of the offenses of conviction.  The defendant was the mastermind of a $30 million bribery scheme.  The defendant engaged in this bribery scheme through corrupt dealings with at least one other USACE employee (Alexander), the prime contractor (EyakTek), four subcontractors (ATG, Big Surf, Corbett's companies, and Nova Datacom), and one subcontractor controlled by the defendant himself (Ananke).  The loss to the government was not limited to the value of Khan's honest services, but included $30 million in procurement fraud.  That is, with the exception of Corbett, the bribe payors did not have to go "out of pocket" to pay the bribes to Khan.  Instead, the corrupt contractors used

stolen monies obtained through fraudulently inflated and fictitious invoices, which were approved by Khan, to finance their bribe payments to Khan.

Through the course of the conspiracy, Khan also was the central figure in the attempt to steer the CORES Contract to Nova Datacom.  The co-conspirators intended the value of the CORES Contract to reach nearly $1 billion over a five-year period.  If successful, the co-conspirators would have had a thoroughly corrupt enterprise – Nova Datacom – as the prime contractor and gateway to nearly $1 billion in government funding.[14]  This conduct falls squarely within the heartland of the Guidelines concerning bribery and money laundering.

The motive for the defendant's criminal conduct is easily identified: greed on a massive scale.  The defendant primarily used his ill-gotten gains to finance a lavish lifestyle and to attempt to build a real estate empire.  The defendant used portions of the stolen funds to pay off the mortgage and to refurbish his primary residence on Chambliss Street in Alexandria, Virginia.[15]  Khan also spent the stolen proceeds in connection with the purchase of another dozen pieces of real property.[16]

---

[14]     The "loss" amount under Section 2C1.1(b)(2) is based on the value of the bribe payments intended for Khan's benefit through the TIGER Contract.  The loss amount does not include the amount of profit the co-conspirators intended to obtain through their efforts to steer the CORES Contract to Nova Datacom.  The CORES Contract had an award potential for all contracts placed against it of up to $790,000,000, with an expressed intent to seek an increase after award for an additional 25 percent, for a total award value of nearly $1 billion.  A ten-percent annual profit margin on the CORES Contract, which was consistent with, for instance, the TIGER contract, would have resulted in an intended benefit to be received by Nova Datacom of nearly $100 million.  As a result, the stipulated Guidelines Level 39 arguably understates the intended harm to the government.

[15]     Pictures of the defendant's primary residence are attached hereto as Tab 3.

[16]     Pictures of some of the defendant's investment properties are attached hereto as Tab 4.

-19-

At one point during the conspiracy, Khan and members of his immediate family owned in full ten automobiles.[17]

Khan's greed was insatiable, which eventually led to his arrest in October 2011. In the Summer of 2011, at a time when Nova Datacom owed Khan at least $6 million in outstanding "overhead," Khan was still actively scheming to include millions of dollars in "overhead" in future Nova Datacom contracts and subcontracts. A significant reason why the investigation went overt with Khan's arrest on October 4, 2011, rather than a date later in the Fall when the authorities could see if Khan was successful in steering the CORES Contract to Nova Datacom, was because the size and intensity of Khan's cash demands from Cho were too great for the undercover operation to continue.

C.      **The history and characteristics of the defendant**.

The history and characteristics of the defendant demonstrate that a Guidelines sentence at an offense level 39 (pre-departure) is reasonable in light of the need to protect society from the defendant for a significant period of time. The defendant has no one to blame for his criminal conduct but himself. There is nothing in the defendant's background as a son, brother, husband, or father that appears to have triggered his criminal conduct. He appears to have led a normal childhood, obtained a college degree, and worked his way from lower-level jobs after high school and college to a high-level decision making position at USACE.

There apparently was also nothing in the defendant's background that could have led one to predict that he would engage in such criminal conduct. Other than an arrest in 1988, which was

---

[17]     Pictures of some of the vehicles purchased and/or leased by the defendant using the bribe proceeds are attached hereto as Tab 5.

subsequently dropped, the defendant had no prior criminal history.  His most recent job rating by his supervisor at USACE in 2010, which rated him at the highest level, reported that the defendant, among other things, demonstrated "complete loyalty to the organization, its mission and people" and "possesses unquestionable integrity."

But make no mistake: This defendant has engaged in crime of historic proportions in the context of procurement fraud.  The defendant led a $30 million bribery scheme that went on for over four years and ended only because of his arrest.  At the same time he was stealing from the government, he used his official position to attempt to steer a nearly $1 billion government contract to a favored contractor (Nova Datacom).  That conduct alone merits a term of imprisonment consistent with a total offense level 39.

But there is additional conduct by the defendant that the Court should take into account in assessing the defendant's character.[18]  This conduct became known to the government during its interception of wire and electronic communications from Khan's cellular telephone, which commenced in late June 2011.  Specifically, this conduct relates to communications between Khan and a male in the Philippines (hereinafter referred to as "Arnee").  These communications reveal two events: (1) a disturbing connection between Khan and Arnee concerning an apparent physical assault

---

[18]     Because the conduct is not related to the offenses of conviction, it should not be included as relevant conduct for purposes of determining the offense level under Section 1B1.3 of the Guidelines.  Instead, the government provides this information concerning the character and conduct of the defendant for the purpose of assisting the Court in imposing an appropriate sentence.  *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4 (same).  Although this conduct reflects poorly upon the defendant's character at the time that he engaged in the conduct, his more recent conduct in accepting responsibility for the conduct reflects favorably upon his character.

on Khan's mistress in the Philippines; and (2) Khan's apparent intent to travel to the Philippines to engage in prostitution with a girl represented to him to be 15 years old.[19]

The intercepted communications between Khan and Arnee concerning an apparent assault on Khan's mistress in the Philippines began on July 13, 2011.  Immediately prior to the intercept of that first text message, there were text messages between Khan and one of his mistresses, who lived in the Philippines.   The woman texted Khan that she had been robbed and assaulted in the Philippines at knife point by three strangers.   While consoling her about the assault via text messages, Khan concurrently exchanged text messages with Arnee.  In those texts, Arnee appeared to take credit for the assault on the woman.  The following texts were written as follows and took place on July 13, 2011:

| | |
|---|---|
| **Khan**: | How you doing bro. |
| **Khan**: | [The mistress] said 2 guys and a woman put knife to her neck and robbed her. |
| **Arnee**: | Im doing a litle business bro. |
| **Khan**: | Hahahah!!That's great bro, am impressed. |
| **Arnee**: | You like it bro is my boy the one fix your problem bro. |
| **Khan**: | Yes loving it. |
| **Khan**: | Hahahahah. |
| **Khan**: | You my bro. |
| **Khan**: | She said she was screaming and scared. |

---

[19]     Copies of these intercepts were provided to defense counsel as part of the government's discovery.  If requested, the government can also provide copies to the Court.

| | |
|---|---|
| **Arnee:** | Yea bro anything u want I do it bro I give my boy litle bonus bro hehe. |
| **Khan**: | That's good bro, hahahah!! |
| **Arnee:** | It ok bro job work its good.  Bro I give couple thousand bro it ok bro anything u tell I do it bro. |
| **Khan**: | Yea it worked real good bro, we can have some fun when I get there. |
| **Arnee:** | yea bro I tell my boy see u couple week bro I fix evrithing bro for u. |
| **Khan:** | She said it happen in friendship by AC gym in daylight. |
| **Arnee:** | Yea bro becuse my boy is verry clean work en the have plant everithing I tell hin bro it ok bro the work. |
| **Khan**: | Yea he do good work. |

Khan followed up these texts with a call to Arnee on July 14, 2011**.**  During the call, it appeared that they discussed the assault on Khan's mistress.  Arnee asked Khan if "my boy here" did a "good job."  Khan replied, "Yeah, you did a good job, man, good job because, um, um, she, she told me, she was screaming and she got scared as shit.  And, uh, she knows that since she fucked up with me, you know, her life is just fucked up and all kinds of shit."  Khan also stated, "I'm getting her out of my system, man.  I feel good about that shit when I heard that, you know?"  Khan also stated, "your boy is good, man, he working it the right way."

Following the incident with Khan's mistress, Khan exchanged text messages with Arnee that appeared to relate to prostitution, including subsequent text messages that appeared to relate to prostitution of a minor during a visit to the Philippines that Khan planned to take in August 2011. Between July 15, 2011 and August 17, 2011, Khan and Arnee exchanged text messages concerning

Khan's intended travel to the Philippines.    For example, on July 15, 2011, Khan and Arnee exchanged the following text messages between each other:

| | |
|---|---|
| **Arnee:** | Yea bro just play en enjoy the life bro see u in August bro I give u nice girl bro very young bro hahaha. |
| **Khan:** | Really??  What she look like?  Send pic hahah!!!" |
| **Arnee**: | Yea bro tom I send tou u bro becuse not work in bar but she nice girl bro but w8 the time went she 18 but fix went u come her bro very sexy bro. |
| **Khan**: | Ok bro, sounds good bro. |

On July 16, 2011, Khan and Arnee exchanged text messages between each other that appeared to relate to prostitution, including prostitution of a girl referred to as "Angelica" who was represented to Khan to be fifteen years old:

| | |
|---|---|
| **Arnee:** | Bro I send u the pic.in email. |
| **Khan:** | Ok bro will check it and let you know, just woke up.  No word from [Khan's mistress] in ah few days. |
| **Khan:** | Yea nice bro I see angelica pic :). |
| **Arnee**: | Yea bro she very young bro is 15 but she wild girl bro en need money bro I fix went u come her bro sexy bro. |
| **Khan:** | I see that, ye we do her and her friend hahaha![20] |

On July 17, 2011, Khan and Arnee exchanged additional emails regarding Khan's apparent intent to travel to the Philippines to meet "Angelica":

| | |
|---|---|
| **Arnee:** | Hi bro how are us nice pict. angelica. |
| **Khan:** | Yea bro nice I want to hit that :). |

---

[20]     Although the government subsequently searched Khan's known e-mail account, the government did not recover e-mail communications between Khan and Arnee.

| | |
|---|---|
| **Arnee:** | Yea bro I fix went come her bro. |
| **Khan:** | Thanks Bro, soon next month. |
| **Arnee:** | Yeah bro first week bro give me txt or cal bro I book u rm bro. |
| **Khan:** | Not first week, about 20th August. |
| **Arnee:** | Ha ok bro no problem bro I reserve to u angelica bro hahaha. |
| **Khan:** | Yes thanks, I appreciate you bro :). |
| **Arnee:** | No problem bro anything u want I do it for u bro. |
| **Khan:** | Much thanks, bro, you are a good brother and man to me bro.  God Bless!! |

On July 21, 2011, Khan and Arnee exchanged more text messages that appear to relate to Khan's desire to meet the girl referred to as "Angelica" who was represented to Khan to be fifteen years old:

| | |
|---|---|
| **Arnee:** | Hi bro how are angelica waiting 2 bro haha. |
| **Khan:** | Really?  Wiwwwwww!  Did you tell her about me? |
| **Arnee:** | Yea bro but just litle by litle bro very young bro hehe. |
| **Khan:** | Hahahah is she virgin? |
| **Khan:** | Am sure she us fucking bro, hahahaha!!. |
| **Arnee:** | Yea bro virgin bro she 15 yrs old bro but I talk bola2 bro she need money bro hehe. |
| **Khan:** |  Ok bro if you say so, will see :). |
| **Arnee:** | Yea bro but went u come her I fix bro for u only hahaha. |
| **Khan:** | Sounds good to me bro, I will do a test drive yea. |

On July 22, 2011, Khan and Arnee sent text messages between each other that appear to relate to Khan's intent to meet "Angelica" during a planned trip to the Phillipines:

Arnee:      Hi bro how are u I talk ready angelica bro hehehe waiting2 bro.

Khan:       Hahahah, yea, am ready to bust that bro :).

Arnee:      Yea bro just relax en enjoy your vacation bro.

Khan:       Yea this time I will bro.  We go to subic or somewhere else too.

On July 23, 2011, Khan and Arnee sent text messages between each other related to "Angelica":

Arnee:      Hi bro how are u.

Khan:       Hi bro how are you?  Am ok just waiting to do Angelica hahahH!.

Arnee:      Yea bro come her adjust your sked bro hahaha.

Khan:       Yea bro, I am working it bro.

Arnee:      You come first week of next month bro.

Khan:       Nah bout 15 or 20, too much work to do first bro.

Khan:       Would love to come there now.

Arnee:      Yea bro I reserve to u angelica bro.

Khan:       You keep her nice and tight for me hahaha!!!

Arnee:      Yea bro I give little load angelica to always txt en cal bro.

Khan:       That's good bro, thanks, I want to play with that bro.

On July 30, 2011, Khan received a text message from Arnee reading: "Hi bro how are very close u come her ready the girl en vitamine bro angelica bro hehehe."  Khan responded via text message: "Yes bro can't wait to get angelica in the bed ;)."

On August 7, 2011, Khan and Arnee exchanged text messages as follows**:**

> **Arnee**:     Hi bro how are u?
>
> **Khan**:     Ok Bro, how are you? How is Angelica is she still ah virgin? Hahaha!
>
> **Arnee**:     Im ok bro yea bro stil chery cain wait bro
>
> **Khan**:     Hahaha!!! Cherry is ready for me to pick it hahHa!

On August 14, 2011, Khan and Arnee exchanged text messages as follows:

> **Arnee**:     Hi bro how are u angelica alwaYs txt me excited bro haha cain wait
>
> **Khan**:     Am glad bro yea be there to bust her bro
>
> **Arnee**:     Yea bro im excited all u want bro is ready bro
>
> **Khan**:     Great, yes can't wait
>
> **Arnee**:     I reserve the rm about on 22 about the arival in clark or in manila bro
>
> **Khan**:     In Clark**.**

These text messages and subsequent ones confirmed Khan's intent to travel to the Philippines on August 22, 2011, to meet with Arnee and the girl referred to in the text messages as Angelica.

Based on Khan's intent to travel to the Philippines on August 22, 2011, for the apparent purpose of engaging in sexual relations with a girl represented to him to be 15 years old, law enforcement agents took steps to dissuade Khan from leaving the country without blowing the cover of the on-going bribery, kickback, and bid-steering investigation. *See* Tab 1 (Arp Dec.) at ¶ 11. On the morning of August 18, 2011, an agent from the FBI and an agent from the Defense Criminal Investigative Service went to Khan's residence in Alexandria, Virginia, as part of an unannounced

visit to meet with Khan.  The law enforcement agents arranged the meeting with Khan in an effort

to dissuade Khan from traveling to the Philippines.  In order to maintain the secrecy of the on-going

investigation, agents told Khan that they had learned from foreign law enforcement authorities that

Khan had communicated in the past with a man named Arnee, who was suspected of engaging in

sex trafficking.  Although Khan acknowledged knowing and meeting Arnee, Khan denied that Arnee

had ever offered prostitutes to Khan or discussed prostitutes with Khan.  The agents explained to

Khan that due to Khan's top secret security clearance, he could be a candidate for blackmail by

foreign nationals and/or foreign intelligence agents.  The agents advised Khan of the dangers of

maintaining contact with Arnee or traveling to the Philippines in the coming months.  Khan told the

agents that he planned to visit with Arnee the week of August 22, 2011, but would refrain from

traveling to the Philippines until after December 2011.  As a result of that interview, Khan changed

his plans to travel to the Philippines and the undercover operation continued.  *Id.*[21]

Although Khan modified certain of his behaviors after that interview with the law

enforcement agents on August 18, 2011, he did not modify his greed.[22]  At the time of his arrest on

the morning of October 4, 2011, Khan was expecting Cho to visit Khan at Khan's condominium in

Falls Church, Virginia.  The primary purpose of the meeting was for Cho to make an on-line bank

transfer of $6 million in bribery proceeds to Khan's account.

---

[21]     Law enforcement agents also worked concurrently with foreign law enforcement
authorities in an effort to disrupt Arnee's suspected involvement in sex trafficking.  *Id.*

[22]     As a result of the interview with law enforcement agents on August 18, 2011,
Khan changed his cellular telephone number, ceased communicating with Arnee, and accelerated
his plan to resign from USACE to allow him to travel internationally without having to disclose
his travel plans to government security officers.  *Id.* ¶ 12.

**D.     The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; and (C) to protect the public from further crimes of the defendant.**

Here, a Guidelines sentence at an offense level 39 (pre-departure) is also reasonable in light of the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment for the offense, and to afford adequate specific and general deterrence.  For over a four year period, the defendant engaged in a massive bribery scheme.  The amounts of the bribe payments involved in the scheme were already off the charts, but were nevertheless continuing on an intensifying upward trajectory due to the insatiable greed of the defendant and his co-conspirators.  Those bribe payments, alone, would merit decades in a federal prison.  But the defendant also was convicted of attempting to steer a nearly $1 billion government contract to a favored government contractor.  Such bid steering conduct, alone, would also merit years in a federal prison.  In addition, his scheme victimized a federal agency, USACE, whose primary mission supported Army and Air Force installations around the World, including war zones.  In effect, Khan took money intended to improve the effectiveness of our nation's war fighters and spent it on himself and his family.  Taken together, the Guidelines range of 262-327 months (pre-departure) reflects the seriousness of the bribery and bid-steering schemes and provides just punishment for those offenses.

The need to specifically deter the defendant from engaging in future criminal offenses also supports the reasonableness of a Guidelines range of 262-327 months (pre-departure).  Although the defendant has no prior criminal history, his first criminal conviction was a blockbuster.  Throughout the scheme, the defendant showed no real regard for the rules that applied to him as a public official.  In addition, as discussed above, the defendant's disturbing connection to an apparent assault on his

Filipino mistress and apparent intent to travel to the Philippines to engage in sexual relations with a girl represented to him to be fifteen years old suggest that he is not a good candidate for rapid rehabilitation.

For similar reasons, the need to deter others from engaging in similar criminal conduct supports the reasonableness of a Guidelines range of 262-327 months (pre-departure). Such a prison term would send a strong message to other public officials that the criminal law will deal harshly with those who accept bribes or otherwise corrupt the federal contracting system on such a massive scale.

     **E.     The kinds of sentences available**.

The maximum statutory term of imprisonment here is thirty-five years, *i.e.*, fifteen years for bribery (Count Two) and twenty years for money laundering conspiracy (Count Four). The Court may also impose a term of supervised release of not more than three years for Counts Two and Four (the supervised release terms must run concurrently).

For Count Two (bribery), the Court may impose a fine pursuant to 18 U.S.C. § 3571(b) of the greater of: (1) $250,000 pursuant to 18 U.S.C. § 3571(b)(3); (2) three times the monetary equivalent of the thing of value demanded, sought, received, accepted, or agreed to receive by a public official pursuant to 18 U.S.C. § 201(b)(4); or (3) twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d).

For Count Four (money laundering conspiracy), the Court may impose a a fine of $500,000 or a fine of twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, pursuant to 18 U.S.C. § 19569(h), or a fine of twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d).

According to the PSR, the defendant does not have the ability, based on the forfeiture agreement and mandatory restitution, to pay an immediate fine.  *See* PSR at p. 36, ¶ 177.  As a result, the government does not recommend a fine.

**F.     The sentencing range established by the Guidelines.**

The government and the defendant stipulated in the plea agreement to an adjusted offense level of 39 (pre-departure).  With a Criminal History category I, which the PSR has recommended, the resulting advisory sentencing range under the Guidelines is 262-327 months.  As stated above, the government recommends a three-level downward departure under USSG § 5K1.1 based on the defendant's substantial assistance, for an adjusted total offense level of 36.  The resulting Guidelines range, therefore, is 188-235 months.

In the plea agreement, the parties stipulated that the applicable fine range under the Sentencing Guidelines applicable to an offense level 39 is from $25,000-$250,000.  The Probation Office calculated the fine range under the Guidelines as $25,000-$500,000.  *See* PSR at p. 39, ¶ 204.

Since the offenses are a Class C Felonies, the guideline range for a term of supervised release is one to three years.  *Id.* ¶¶ 191-192.

**G.     Any pertinent policy statement issued by the United States Sentencing Commission.**

As stated above, the government has moved for a three-level downward departure under Section 5K1.1 of the Guidelines.

**H.     The need to avoid unwarranted sentencing disparities among defendants with similar records.**

A Guidelines sentence at an offense level 39 (pre-departure) would also be reasonable in light of the need to prevent disparities between the defendant and defendants in similar cases.  Due to the

-31-

magnitude of the fraud involved here, the government had difficulty finding similarly situated defendants.  Nevertheless, the government has prepared a sentencing chart depicting sentences in the last five years involving similarly situated defendants, *i.e.*, public officials or government contractors involved in bribery-related offenses.[23]  The closest comparison to the defendant in terms of federal officials appears to be John Cockerham.  *See United States v. John Cockerham*, (W.D. Tx. 2009).  Cockerham was a twenty-year Army veteran who obtained the rank of Major.  As part of his official duties, he worked as a Contracting Officer with the authority to award contracts of up to $10 million.  He was convicted of soliciting $15 million in bribes and accepting $9.6 million in bribe payments.  Cockerham's offense level was 41 (pre-departure), and he was given a four-level downward enhancement for his substantial assistance, resulting in a total offense level of 37.  He received a sentence of 210 months.

I.      **The need to provide restitution.**

The government has calculated the amount of restitution owed by the defendant as $32,553,252.93.  Restitution is owed to USACE.

---

[23]      The chart is attached hereto as Tab 6.  The government obtained the information on the chart from public records, specifically press releases, court filings, and annual reports prepared by the Department of Justice, Criminal Division, Public Integrity Section.

**CONCLUSION**

For the foregoing reasons, the government respectfully moves for a downward departure under U.S.S.G. § 5K1.1, with a recommended downward departure of three levels, resulting in an adjusted total offense level of 36 (188-235 months).  The government recommends a sentence of 188 months, three years of supervised release, and restitution in the amount of $32,553,252.93 payable to USACE.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
For the District of Columbia


By:   _____
      MICHAEL K. ATKINSON
      JAMES A. SMITH
      ANTHONY D. SALER
      Assistant United States Attorneys
      Fraud and Public Corruption Section
      555 4th Street, N.W.
      Washington, D.C.  20530
      (202) 252-7817 (Atkinson)
      Michael.Atkinson2@usdoj.gov

Dated: February 5, 2013